By the Court.
These three cases involve, substantially the .same questions. The first two were heard together. Owing to the urgent necessity for an early disposition of these two cases, they were not held to await the preparation of an opinion, bu,t, on account of their importance, a short and hurriedly prepared memorandum, giving the major reasons for the conclusions reached, was filed with the entries of the judgments in these cases, and the opinion delayed until the later case was heard and disposed of and the three cases could he reported together.
The principal question and the one common to all of these cases is the question of the authority of the secretary of state to hear and determine the validity of the petitions filed with him. That question is no longer .an open one in Ohio.
This court has repeatedly held that elections belong to the political branch of the government and not to the judicial. That proposition is fully discussed, and the authorities cited and considered, in the case of Link v. Karb, Mayor, et al., decided December, 1913, 89 Ohio St., 326; also in the case of The State, ex rel., v. Joyce, 87 Ohio St., 126, in which it is held, in a per curiam opinion, concurred in by all of the members of this court participating in that case, that “Those matters are not per se the subject of judicial cognizance, but are matters for political regulation and well within the legislative power.”
Section 4785, General Code, provides: “Except, when otherwise provided by law, all public elections in this state shall be conducted according to the *314 provisions, of this title.” This section is part of Chapter; .1, Title XIV, Part First, General Code, entitled “Public Elections.” ■
It is, therefore, apparent that the submission of á law passed by the general assembly to the electors of the state, under the provision of the- amendments to the .constitution authorizing a referendum vote thereon, comes within the operation of the laws of this'1 state relating to all public elections.-
This court has held in the cases of Chapman v. Miller, 52 Ohio St., 166; Randall v. The State, ex rel., 64 Ohio St., 57; The State, ex rel., v. Stewart, 71 Ohio St., 55, and The State, ex rel., v. Joyce, 87 Ohio St., 126, that the decision of the secretary of state, acting as the state supervisor of elections, upon written objections to. certificate of nomination and nomination papers, whether nominated by petition or otherwise, or upon other questions arising in, the course of nomination of candidates, is final, and that in such case .the courts have no. jurisdiction of the subject-matter and any. judgment or order of the court- in reférence. thereto is void. True,.the sta'u e in this particular specifically confers shell jurisdiction on the secretary of state, acting,as .state supervisor and inspector of elections,, but the legislature has provided in Title XIV, Part First .of the General Code, a comprehensive plan and system for the conduct of all elections, general -and special, and- has committed to the state supervisor and inspector of elections and deputy state supervisors and inspectors of elections the duty and authority to conduct the same, and specific enactment has extended their authority to nomination of.-cam *315 didates for office, or any .other question in relation thereto, but as to elections the authority conferred by the legislature of the state upon these officers is general and comprehends the entire subject-matter. These provisions in nowise conflict, with Section-1, Article IV of the Constitution, which vests all judicial power in the Courts of this state.. It is .plain that these amendments to the constitution'do- not provide for any change in the existing system of elections or the officers charged by law with the conduct and control of the same. That appears from the provisions of these amendments.
In Section. Ig, Article II, it is provided that the petition and signatures Upon referendum petitions, ‘ -so verified, shall be presumed to be in all respects sufficient, unless not- later-than forty days before the election, it shall be otherwise proved.” Section lc, Article II, provides that, when proper petitions are filed, “the secretary of- staté shall' submit to the electors of the state for their approval or rejection such law, section or item, in the manner herein provided, at the next succeeding regular or general election in any year occurring subsequent to sixty days after the filing of such petition;” it therefore appears that the language in Section lg, Article IT, “not later than forty -days .before the election,-’ means the next succeeding regular -or. general' election-in any year occurring.subsequent to sixty days after the filing, of the referendum petition. .
Construing these two sections of the amendment® together, it is very plain that a -referendum petition filed sixty and one days before the next regular or general election'in any year requires , the. secretary *316 of state uo submit the law to the approval or rejection of electors at that election, and the proof of invalidity or insufficiency of the petition must be made not later than forty days before that election. This .would leave twenty-one days in which to máke these proofs, clearly not sufficient time for process, anh unless process were waived the courts would be powerless to grant any relief within the time liriiited. Certainly it was not contemplated by these provisions in our, constitution that this important question as' to the sufficiency or validity of referendum petitions should be left to the pleasure of an interested party to waive or insist on due process. Such conclusion is too absrird to require further discussion; The only construction of these two provisions of the constitution.possible is that the secretáry of state, acting as state supervisor and inspector of elections, should have the sartie right and authority to determine this preliminary question that he has to determine other questions preliminary to any other public election.
In view of the fact that this is a political question and not a judicial one, and the further fact that the constitution does riot specifically provide that only the courts of the state shall have the jririsdictiori to hear and determine the same, it follows that it was the intention and purpose fo leave this question to be determined by the same áuthority and in the same manner that similar questions relating to the nomination and electiori of officers and the submission of other questions fo the electors of the state are to be determined.
If these questions were of a judicial nature then *317 that would end the controversy, for under the provisions of Section 1 of Article IV of the Constitution the courts would have jurisdiction without further or specific provision to that effect, either in. the constitution or the laws of this state, but being a political question the courts would not have jurisdiction without special delegation of such authority.
Thé argument that the validity of the election must be proved in the courts of this state, because of the insufficient machinery at the disposal of the secretary of state, must fail for the very good reason that the legislature of the state has specifically conferred jurisdiction upon the secretary of State to hear and determine questions equally important and has specifically provided that his judgment thereon shall be final, and the validity of these laws has been sustained by this court in the several cases hereinbefore cited.
Section 4785, General Code, brings elections of every kind and character within the control of the state supervisor and deputy state supervisors of elections, and, in the absence of specific legislation to the contrary, it is mere quibbling to say that these officers shall have authority to determine certain questions preliminary to an election, but that other questions similar in their nature shall be reserved for the determination of the court, and particularly is this true where the' time for the determination of sjuch questions is not sufficient for the ordinary processes of the court.
It, therefore, follows that the secretary of state, when acting as state supervisor and inspector of elections, not only has the authority to hear and de *318 termine these questions^ but it is his absolute duty to protect the state ahd the people of the state from any and all abuse of the privilege of direct legislar tiom * ...
. The demurrers to the first cause of action in the petitions in. the-first two cases are, therefore,- sustained.
■ ¡While this court has .repeatedly held that the state supervisor and deputy state. supervisors and inspectors of elections have full and final authority to hear and-determine questions of a similar nature to the ones' here presented, it by no means follows that the courts have no authority to relieve against abuse of discretion or fraudulent and corrupt judgments entered by these officers. In the case of The State, ex rel., v. Stewart, 71 Ohio St., 55, it was fsaid by this court on page 72, Davis, J., writing the opinion:
f,- “We do not know, and we have not inquired;, which of these contestants is the rightful candidate of, the Republican party. That inquiry ■is not before us in this procéeding. •
‘-The relator.charges that he has no plain or adequate remedy in the ordinary course of the law. If the relator had alleged that the decision of the chief deputy state supervisors and clerks of the election boards of the several counties comprising the district had been fraudulently and corruptly procured he might, pferhaps, be ;said to; have disclosed that he did have an adequate remedy -by the’ ordinary processes ¡of-the law in a cofirt of equity.”
b,- This correctly states the - laAv of -this state,* and, therefore, the-demurrers td the Second cause óf ac *319 tion in' the petition 'in the first two cases áre overruled.
; ■ Upon the charges made in the amended petitions in the first two eases and in the petition in the lást case, that the conduct of the secretary of state was fraudulent, in bad faith, an abuse of discretion and in furtherance of a state-wide conspiracy to prevent a referendum vote- on these laws, the evidence is all one way. In fact, the relator has failed to introduce any. evidence to sustain these charges. On the other hand, all the evidence offered here tends to prove that the investigation by the secretary of state was' conducted-fairly, publicly and in good faith, and that his judgment is sustained by- the evidence before him.
It further appears that the relator and his counsel refused the secretary of state any and all assistance in this investigation and Withdrew from the hearing after evidence was offered, showing beyond all-question that there was fraud iii obtaining the'signatures of the soldiers at the Soldiers’- Home at Dayton, Ohio, in the last above-named' case, and that the affidavits attached to parts of this petition were knowingly and intentionally false.-
f It further appears- that notwithstanding the relator and his counsel withdrew from these hearings he was furnished from day to day with typewritten copies of the stenographic report of the hearing before the secretary of state, and at no time during the continuance of the hearing did the relator or his; counsel call the secretary’s attention tó'any-facts; upon which they now claim to have knowledge that1 would have aided him in arriving at a correct judgment.
*320 It is undoubtedly true that a great amount pf in; competent evidence was offered on this hearing, blit the competent evidence is sufficient to show beyond all reasonable doubt that these petitions in all these cases were permeated with fraud and the affidavits to a large number of parts were knowingly 5and in; tentionally false. Some of the signaturesfre. shown to be forgeries. . Other parts contain names of persons dead long before the petitions were circulated, names of nonresidents of the state and names of persons not naturalized citizens of the? United States. The evidence of the relator himsejit., is particularly important in a determination of This question. He testifies that it was apparent to him that many of the petitions returned to his office,, containing approximately 40,000 signatures, were fraudulent and that “There were forged, names, written by one man without authority, or 'phoney’ names or something of that sort. They were, .in. other words tainted petitions, and I did riot wish to filé any'petition that was tainted.” He further testifies that he employed the highest-priced handwrit-. ing expert in Ohio to assist him in. separating the. good from the bad, and that they rejected an aggregate of 40,000 signatures, none of which was filed with the secretary of state; that his judgment and the judgment of the handwriting expert, as to which, signatures were forged and which were genuine, were predicated entirely upon the examination of the petitions brought to them, and that further than that he made no investigation. In that connection his testimony is as follows: “Apparently the early petitions, one or two or three, were good, and then *321 he;[the circulator] leax-ned how to become crooked' or;-became, crooked,- and the -rest of his petitions were bad.” Notwithstanding he theii knew-.that! these circulators of-these petitions had become corrupt and had tried to impose upon him to the extent of- 40,000 names, he continued them in his employ. He testified, however, that in some instances different iones were employed. In that connectioh he ¡.testified as follows: “Q. Oh.the whole, were these instances few; or substantially the same? A. I believe substantially the same.” Some of these circujators of petitions testified in éffect that they were out to get names-regardless of how they got-them.' -They also -testified that there were many parts- of these petitions,. purporting to have been verified', by. them, to which they were not sworn at all. -
The evidence of M. J. Hancock, who' circulated many of these petitions, is as follows: “Well, we would walk into the office. They would say, ‘HoW many petitions have you got?’ and we would put them- down and say, so many. ‘Sign your “John Hancock” there,’ and that was all there would be of it.
“Q. And then you would get your money? A.' Get my check and walk out.
“Q. . And- there would be no .notary there at'-all? 'Ai- No notary. '
■ ‘“Q. Did you know how many solicitors- you saw treated in that way. A. I could not answer, but possibly four or five; sometimes two or thrée; sometimes five or six.”
The same witness testifies also that he swore to no *322 petitions whatever until about the last day of July, when Mr. Castle said to him that “They are drawing pretty tight lines around here and you will have to swear to these,” and the witness replied, “All right.”
The evidence of Thomas F. Winn is to the same effect. These two men worked together. The same character of evidence was given by other solicitors.
It is true that it is agreed that the officers, said to have taken their affidavits, would swear just as positively to the contrary, yet surely the secretary of state could not be found guilty of fraud, corruption or abuse of discretion by believing some of these witnesses and disbelieving others; but even if the evidence of these circulators in this behalf is untrue, it would only go to show that these petitions were secured by men who were unscrupulous perjurers, determined to .get the relator’s money regardless of the service rendered. In fact, either way this evidence is considered, the parts of the petitions secured by these men are discredited.
It is insisted, however, that all the names upon any part of a petition should not be rejected because one or more is forged, false or fraudulent, and that is true if the verification to that part is not a perjury. These petitions and each separate part thereof depend for their efficiency and their validity upon the affidavit of the circulator that each of the signatures attached to such part was made in the presence of affiant; that to the best of his knowledge and belief it is the signature of the person it purports to be; that he believes the person who signed it to be an elector; that he signed the petition *323 with knowledge of the contents thereof; that each signer signed the same on the date set opposite his name. If it appears from the evidence that the affidavit so attached to any petition or part of a petition is knowingly and intentionally false, then the affidavit is a perjury and can serve no purpose whatever; the whole part of the petition dependent thereon for its validity must fall.
It must be conceded that any part of a petition to which no affidavit whatever is attached would have to be rejected in toto. The constitution requires an affidavit to each part of a petition, and without that affidavit it would be as worthless as blank paper, no matter if every signature thereon were genuine. An affidavit proven to be wilfully, corruptly and intentionally false is worse than no affidavit at all, for it brands the whole part of the petition to which it is attached with the indicia of fraud. If no affidavit is fatal to the whole petition or any separate part thereof, although the lack of such affidavit is due to innocent mistake, oversight or inadvertence of the person circulating the same, and if all the signatures appearing thereon must be rejected without reference to whether they are genuine or not, upon what rule can it be said that it is the duty of the secretary of state, where it appears that the affidavit to any part of a petition is wilfully, corruptly and intentionally false, to determine upon other evidence the genuineness of signatures appearing thereon and, if he finds that there are some genuine signatures upon that particular part, to include them in the count ? Such a holding would be an invitation to commit fraud and perjury.
*324 It is not sufficient that some of the signatures' óft some of the parts of a petition are genuine, nor is it absolutely necessary to the validity of the petition or .any part thereof that every signature thereon should be genuine; but it is absolutely necessary to the validity of the petition or any. part thereof that the circulator, when he makes affidavit certifying the signatures on these petitions, should believ'e that he is stating the truth. If it later appear that some one has imposed upon him and signed Or forged the name of another, the circulator may Still believe in the truth' of his affidavit and it -will support every genuine signature upon it, and only the ones not genuine will be stricken therefrom. But if the circulator knew that a signature appearing on such- part of a petition was not genuine; if he knew that such signature was not written on the petition in his presence; if he knew that the person whose signature it purports to be.was not an elector; if he knew that.the person signing said petition did not sign it with knowledge of its contents, yet, notwithstanding his knowledge, he wilfully, corruptly and intentionally makes a false and perjured affidavit to the contrary, then such affidavit is worthless and the petition or part of -a petition to which it ‘is attached does not fill the requirement of the constitution, and the genuine signatures thereon cannot be counted for' the reason that that part of the petition, lacks the affidavit required by the constitution. ' . ' A
■ The' relator is here seeking a peremptory writ ,of mandamus. It is the settled law of this state that before such a writ will issue the relator must show *325 a clear right to the writ. Instead of this evidence showing that the action of the secretary of state was corrupt and fraudulent and an abuse of discretion, it is clear to a majority of this court that no other judgment could be reached in these cases, and if we were receiving this evidence de novo and determining its weight and sufficiency, a majority of this court would be compelled to the same conclusion reached by the secretary of state, for the reason that the averment in relator’s petition, that these petitions for referendum contained enough genuine signatures to require the secretary of state to submit these laws to the electors of the state for their approval or rejection, is not sustained by the evidence.
There is a further question made in case No; 14422 by the averment in the petition that, notwithstanding 20,000 signatures upon the petition' filed were forged and fraudulent, within ten days after this fact was established, the relator tendered to the secretary of state petitions containing 35,000 additional names, and he refused to receive them. The relator admits that there are 20,000 forged .and fraudulent signatures upon these petitions. The evidence shows that there is a far larger number of such pretended signatures.
Applying the rule as to genuineness of signatures ibove stated and rejecting all parts .of these petitions where it is shown that the affidavits attached thereto were wilfully, corruptly and intentionally false, there would remain but a very few parts of these petitions that would fill the requirement of the constitution.
*326 ' The evidence as to fraud in the procuring of names in these petitions is stronger in case No. 14422 than in either of the other cases. In fact, there could not be a stronger showing of wanton, reckless and criminal disregard of the law, of a more direct attempt to prostitute these provisions of the constitution of the state authorizing a referendum vote, than was attempted by the circulators bf these petitions. Any disinterested man who Wants to be fair cannot read this evidence and come to a'ny other conclusion. • There is absolutely no excise-for this particular case being in this court. There was practically nothing left to build upon. The whole foundation was so permeated with fraud and perjury that the superstructure falls of its own weight. ■
'1' The evidence is clear that the relator was not a ■'pkfty to these frauds. He was endeavoring to secure genuine signatures and file valid petitions. He was'willing to pay a fair price to'secure the signatures, but it is equally certain that he was imp'osed upon by the men employed by him for that purpose. The fact, as testified to by him, that he was compelled to throw out petitions containing 40,000 names in cases Nos. 14398 and 14399, and the further fact that it is now admitted by him that at least 20,000 names appearing upon the petitions filed in case'No. 14422 were forged and-fraudulent, demonstrate that the men employed to secure these petitions-absolutely disregarded the law and'wilfully, corruptly and intentionally perjured themselves,' and that they intended to, and almost did, perpetrate the most gigantic fraud ever attempted upon the electors of this state.
*327 Notwithstanding that those interested in Securing this referendum may have been, and undoubtedly were, actuated by proper motives, the fact remains that they called to their assistance many men who had neither character nor integrity and continued them in their employ, after they were fully advised of their dishonest and fraudulent conduct and after it was known to the relator that they had-perpetrated upon him the colossal fraud of returning to his office with the. purpose of filing with the secretary of state parts of petitions containing 40,000 false, forged and fraudulent signatures. Undoubtedly there are upon these petitions the genuine signatures of many electors of this state who honestly and intelligently desired a referendum vote upon these laws, but it is equally clear that many parts of these petitions contained so much fraud, Corruption and perjury that they cannot be taken into account in determining-the number of genuine-signá-' tures filed. -
There is. another reason why no relief could be' given to the relator in this last case. The constitution requires the secretary of state to submit • a' law to the electors for their approval dr rejection at the next general election occurring more than sixty days after the filing of the referendum petitions/" In this case that would be the November election of 1913. These additional names were tendered to the secretary of state within ten days after he found against the validity of the original petitions. If thé' secretary of state abused his discretion, or -was guilty of any fraud in the rejection of these additional names, it was the duty of the relator to ap *328 ply forthwith to a court of competent jurisdiction to compel, the secretary by mandamus to perform the duty imposed upon him by the constitution and submit, this question to the electors at the general election, specified in the constitution itself. The relator, by, delaying to file his petition for a writ of mandamus until a day or two before that election, could not delay the law from going into operation .for a year next after the general election specified in the constitution. This last petition was not filed until October 24, 1913, and by no possibility could issue be joined or the matter heard and determined by this court in timé for a writ in mandamus to. issue .commanding the secretary of state to do and perfqrm the duties required of him by the constitution of the state. Before such a writ could issue the election designated by the constitution, at which this question must be submitted, would have passed into history and the. secretary could not comply with the commands of such writ; so that, whether the action of the secretary of state in this case was right or wrong, the relator acquiesced in it until too late for this court or any other court to afford him the relief asked.
For these reasons, the writ is refused in each of the above-entitled cases.

Writs refused.

. Nichols, C. J., Johnson, Donahue, Wanamaker, Newman and Wilkin, JJ., concur.
, Siiauck, J., dissents front the judgment rendered in the first two cases. He does not participate in the last,